VIVONE, et al.

v.

ACME MARKETS, INC. and American
Stores Company.

Civ. A. No. 83–1787.

United States District Court,
E.D. Pennsylvania.

Feb. 26, 1988.

Phyllis Horn, Philadelphia, Pa., for plaintiffs.

John J. McAleese, Jr., Philadelphia, Pa.,
for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

Seven former employees of Acme Markets, Inc. ("Acme") claim that Acme discriminated against them in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. Two of the seven plaintiffs lost their jobs in June 1982 as a result of Acme's decision to end its operations in the Baltimore area. The other plaintiffs lost their jobs (four were fired, one was demoted) in October 1981 in a reorganization involving the company's management ranks. After a relatively lengthy pre-trial period, during which time 36 claimants filed written consents opting into this class-action lawsuit, the case proceeded to trial in March 1987. Thirty-four of the opt-in plaintiffs and one of the six original named plaintiffs withdrew their claims before trial, so only the claims of seven plaintiffs (five named, two opt-in) were addressed in the March 1987 bench trial.

During the bench trial, the parties agreed that rather than having their experts testify, their expert evidence would be submitted to the court in the form of reports. The evidentiary record was completed as of January 12, 1988.

### I. LEGAL ISSUES

■ Defendants assert that the plaintiffs' claims are barred by the statute of limitations. According to defendants, the statutory limitations period in ADEA actions runs until the plaintiff files a written consent with the court. Applying this tolling principle to the facts of this case, de-

fendants contend that the statute of limitations bars the claims of all the plaintiffs because (1) the named plaintiffs never filed written consents with the court; and (2) the opt-in plaintiffs Culatta and Smith filed written consents outside the two-year statutory period which defendants claim applies to this case.[1]

The premise for defendants' statute-of-limitations defense—that the special tolling mechanism of 29 U.S.C. § 256 applies to ADEA actions—is refuted by the clear language of the ADEA. As the Sixth Circuit has noted, Congress incorporated certain sections of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, into the ADEA, but this incorporation was selective; 29 U.S.C. § 256 is not among the sections of the FLSA incorporated into the ADEA. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); see also EEOC v. Gilbarco, Inc., *615 F.2d 985, 1011 (4th Cir.1980) (Murnaghan, J., concurring and dissenting in part)*, but see O'Connell v. Champion Int'l Corp., *812 F.2d 393 (8th Cir.1987).*

This lawsuit commenced when the Complaint was filed in April 1983. F.R.Civ.P. 3. Since the special tolling provision of the FLSA does not apply, I see no reason to diverge from the ordinary rule that the commencement of the lawsuit tolls the statute of limitations. *Frank v. Capital Cities Communications, Inc.*, 33 EPD ¶ 34,285 (S.D.N.Y.1983) [available on WESTLAW, 1983 WL 643]. It should be noted that this holding does not mean that unnamed plaintiffs have an interminable right to opt into ADEA class-action lawsuits. For example, in the interests of justice, to facilitate trial preparation and settlement discussions, after allowing a fair time for the filing of consents, a court may declare the class closed. Indeed, in this case, defendants asked for and received from this court an

order specifying that all written consents were due within 30 days after notice was mailed to potential opt-in class members. Since both Culatta and Smith filed written consents within this period, their claims are not time-barred.

The fact that Congress incorporated 29 U.S.C. § 216(b) into the ADEA does not undermine the conclusion that Congress failed to incorporate another FLSA provision, 29 U.S.C. § 256. These two FLSA provisions address entirely different concerns; § 216(b) addresses jurisdictional issues, including which unnamed plaintiffs will be bound by a class-action judgment (*i.e.*, only those who affirmatively opt in); § 256 deals with another matter altogether, namely, how a plaintiff tolls the statute of limitations in an FLSA action. Given the separate purposes of these FLSA provisions, Congress could logically and sensibly have chosen to incorporate § 216(b) and exclude § 256 from the ADEA, as the unambiguous statutory language suggests Congress did.

The legislative history behind the 1947 amendments to the FLSA (the Portal-to-Portal Act of 1947) underscores the distinct purposes served by these two FLSA provisions. This legislative history also illustrates why I rejected defendants' argument, raised in their motion to dismiss, that § 216(b) requires, as a jurisdictional matter, that named plaintiffs file a written consent; on this score, too, defendants' interpretation of the statutory framework confuses the jurisdictional requirements of § 216(b) with the special tolling requirements of § 256.

The Portal-to-Portal Act restricted the scope of collective actions under the FLSA. In particular, § 7 of the Act, 29 U.S.C. § 256, stated that in collective FLSA actions, the statute of limitations set out in 29 U.S.C. § 255 would be tolled for each plaintiff, including plaintiffs named in the original complaint, only upon the filing of

---

1. A two-year statute of limitations governs in ADEA actions, unless the conduct complained of can properly be characterized as "willful", in which case the period is three years. 29 U.S.C. § 626(e); 29 U.S.C. § 255(a). However, I need not even pause over the question of willfulness since I conclude that the filing of the Complaint tolled the statute of limitations. Under either a two- or three-year standard, the claims of all seven plaintiffs were timely; the Complaint was filed in April 1983, and the earliest terminations at issue in this case occurred in October 1981.

that plaintiff's separate written consent. On the other hand, § 5 of the Act, which amended § 216(b), narrowed the circumstances under which representative actions could be brought. Before the Portal-to-Portal Act was passed, § 216(b) allowed both representative or agent actions and "spurious" class actions. The 1947 amendment eliminated the former and while retaining the latter, required that represented employees affirmatively opt into the lawsuit. *See LaChapelle v. Owens–Illinois, Inc.*, 64 F.R.D. 96 (N.D. Ga.1974), *affirmed* 513 F.2d 286 (5th Cir.1975); *Burrell v. La Follette Coach Lines*, 97 F.Supp. 279 (E.D. Tenn.1951). Congress adopted the opt-in requirement, a departure from the ordinary opt-out procedures governing class actions under F.R.Civ.P. 23, in order to give employers a greater measure of certainty about whom they would be facing in court and to protect against half-hearted litigation. *LaChapelle*, 64 F.R.D. at 98, n. 3.

Consistent with this legislative history, several courts have concluded that the FLSA requirement that even named plaintiffs file written consents derives not from the jurisdictional/notice requirements of 29 U.S.C. § 216(b) but rather from the special tolling mechanism of 29 U.S.C. § 256. *See, e.g., LaChapelle v. Owens–Illinois, Inc.*, 513 F.2d 286, 289 (5th Cir.1975) n. 10; *Drabkin v. Gibbs & Hill, Inc.*, 74 F.Supp. 758, 759, 762 (S.D.N.Y.1947).

Since the filing of a complaint more than adequately provides the employer with notice of the named plaintiffs' intent to sue, these courts have recognized that Congress' intent to require even named plaintiffs to file written consents must inhere in something other than § 216(b). *See Allen v. Atlantic Richfield Co.*, 724 F.2d 1131, 1134–35 (5th Cir.1984). The reason for requiring named plaintiffs to file a separate consent has nothing to do with notice and certainty for the employer, the purposes underlying § 216(b), but rather with tolling the statute of limitations in accordance with § 256. *See id.*

## II. SUMMARY OF FACTUAL FINDINGS

■ Although the statute of limitations does not bar their claims, plaintiffs have not shown that defendants' proffered rationales for the terminations, poor performance and corporate reorganization, are pretextual. Defendants presented credible evidence that the terminations were undertaken as part of a work force consolidation involving Acme's management ranks, a series of cutbacks necessitated by the company's unfavorable economic prospects in the early 1980s. Performance evaluations guided the selection of the group of employees that were terminated in order to achieve the necessary reductions. In a series of performance evaluations designed to compare each employee to his peers, *i.e.*, those in comparable management positions in the same geographic region, which resulted in rankings of employees from best to worst, six of the plaintiffs received low, and often the lowest, rankings.[2] Although plaintiffs assert that age was factored into these performance rankings, rankings known at Acme as "forced ratings", plaintiffs have not carried their burden of proof on this point; plaintiffs failed to show either that age discrimination skewed the forced ratings, or that when Acme terminated the plaintiffs, Acme was more likely motivated by age discrimination than by the legitimate non-discriminatory performance evaluations. Since plaintiffs have not carried their burden of proof, defendants are entitled to judgment in their favor. *See Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393 (3d Cir.1984) (outlining burden of proof in ADEA actions); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1980).

In 1981, Acme's president determined that overhead costs should be trimmed by 20% to bolster the company's sagging fi-

---

**2.** Acme's rationale for terminating one of the plaintiffs, Stephen Culatta, has nothing to do with performance. Culatta's case and Acme's rationale for his termination are taken up separately later in this Memorandum [this discussion has been omitted for purposes of publication].

nancial condition. In 1979, the need to cut costs had prompted Acme to close approximately 90 stores in Johnstown and Syracuse. Despite these significant cutbacks, Acme's managerial ranks remained largely untouched; the number of management employees in 1981 essentially equaled the pre–1979 number.

Since the size of Acme's management had not been reduced by the 1979 cutbacks in store operations, Acme's senior management decided that the necessary 20% reductions could best be achieved by deep cuts in management. Before the October 1981 reorganization that carried out these cuts, Acme's management had the following structure: one president; several executive vice-presidents; five vice-presidents, each in charge of a division that consisted of varying numbers of districts; twenty-three district managers, each presiding over a district that consisted of several stores; store supervisors in charge of the day-to-day management of the stores; and associate store supervisors who, theoretically, were being trained to assume store supervisor positions. The 1981 reorganization reduced the number of divisions (called "regions" after the reorganization) from five to four. In addition, five districts were eliminated, so that the number of district managers dropped from 23 to 18. Overall, the 1981 reorganization resulted in the termination of approximately 225 Acme employees.

[Information pertaining to individual claimants has been omitted for purposes of publication]

### III. VALIDITY OF THE RATINGS USED

It is clear from the evidence as a whole that the adverse personnel decisions affecting the plaintiffs (except Culatta, as noted previously) are attributable entirely to the relatively poor evaluations accorded them under the "forced rating" system. Thus, the critical issue in this litigation is whether the forced ratings were themselves tainted by age-discriminatory bias. That is, did the raters tend to evaluate older workers less favorably than younger, either because of conscious bias against older workers, or subconscious age-stereotyping?

There is very little direct evidence addressing this precise issue, except for such inferences as may flow from the fact that, when the reductions in force were completed, the average age of the remaining store supervisors and assistant supervisors tended to be slightly lower than the average age of the pre-reorganization incumbents. Plaintiffs have, however, presented the detailed statistical studies of Dr. Siskin, a well-known forensic statistician, expressing the opinion that pre-reorganization store supervisors and assistant supervisors were somewhat more likely to be discharged or demoted if they were in the protected age group than if they were not.[3] The defendant's statistical expert, Dr. Paul J. Andrisani, who is also a well-known specialist in this field, disputes Dr. Siskin's conclusions enthusiastically and at length.

Both experts make valid points. If it were necessary to choose between the two, the choice would reflect my perception that Dr. Siskin's report is the more objective and impartial—Dr. Andrisani's report borders on the polemic at times—but that Dr. Andrisani's report is probably based upon more reliable factual data. It is unnecessary to reach a firm conclusion as to the comparison, however. Assuming the validity of Dr. Siskin's conclusions, his statistical analysis proves only that persons in the protected age group were more likely to lose out in the reorganization than younger employees. As Dr. Siskin readily concedes, these statistics are not inconsistent with the notion that the plaintiffs were in fact less qualified than the employees who were not discharged or demoted.

Perhaps more importantly, the statistical analyses do not provide particularly strong evidence of age-discrimination in any respect. The results with respect to each job-classification are unreliable because of small sample-size. Viewing all affected employees as a unit, the disparities are of only marginal statistical significance. And,

---

3. Defendants' motion to strike various portions of Dr. Siskin's reports is denied.

in the final analysis, it seems clear that the statistical disparities are attributable, almost entirely, to the fact that, in the evaluations and discharge decisions respecting assistant store supervisors, those assistant supervisors who had previously served unsuccessfully as store managers, and had thereafter been demoted to the position of assistant supervisor, fared poorly in comparison with the other assistant supervisors.

In my view, it is not at all surprising that, when making comparative evaluations within the supervisory ranks, the raters would tend to give higher ratings to assistant store supervisors who had not already demonstrated their inability to perform as store supervisors. That single explanation suffices to establish that the statistical disparities referred to by plaintiffs do not support the hypothesis of age-discrimination.

I recognize that the statistical evidence on both sides leaves open many tantalizing questions: perhaps, over the years, Acme tended to under-rate the abilities of its older employees. Perhaps Acme was not sufficiently appreciative of the merits of employees who eschewed advancement, and were satisfied to remain in less demanding jobs. Or perhaps, as defendants argue, Acme was overly solicitous of its long-service workers, and kept them as long as possible irrespective of their incompetence. But this kind of speculation serves no useful purpose. The fact remains that the evidence in this case, taken as a whole, simply does not prove that it is more likely than not that any of the plaintiffs was a victim of age discrimination.

Judgment will therefore be entered in favor of the defendants.