Selena WASHINGTON, et al., Plaintiffs,

v.

Robert VOGEL, individually and in his official capacity as Sheriff of Volusia County, et al., Defendants.

Bankruptcy No. 93–482–CIV–ORL–22.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 22, 1995.

Luis F. Gomez, Orlando, FL, Charles Gilbert Burr, III, Melanie Locklear, Charles G. Burr, P.A., Tampa, FL, E.E. Edwards, Edwards & Simmons, P.A., Nashville, TN, James Edward Clark Perry, Law Office of James E.C. Perry, Orlando, FL, Dennis Courtland Hayes, Willie Abrams, NAACP Sp. Contribution Fund, Baltimore, MD, for Selena Washington.

Luis F. Gomez, Orlando, FL, Charles Gilbert Burr, III, Tampa, FL, E.E. Edwards, Edwards & Simmons, PA, Nashville, TN, James Edward Clark Perry, Law Office of James E.C. Perry, Orlando, FL, for Jorge Nater.

David V. Kornreich, Jeffrey E. Mandel, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Orlando, FL, for Robert Vogel, Volusia County, FL.

### ORDER

CONWAY, District Judge.

### Introduction

This cause is before the Court on Defendants' Motion In Limine to Exclude Plaintiffs' Statistical Evidence, filed November 15, 1994 (Dkt. 164). The Court announced its decision to grant the motion in open court on January 6, 1995, before Opening Statements began.

Under Fed.R.Evid. 702 and the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court has the obligation as "gatekeeper" to determine preliminarily that an expert witness's proposed testimony rests on a reliable foundation and is relevant to the task at hand. After reviewing the deposition of Dr. William Pammer, the Plaintiffs' expert on statistics, and the oral and written submissions of the parties, the Court granted Defendants' Motion because the Court was, and continues to be, convinced that Dr. Pammer's opinions did not rest on a reliable foundation. Additionally, any relevance his opinion had to the issues presented was substantially outweighed by the potential for confusing the jury and unfair prejudice to the Defendants.

### Background

Selena Washington is African–American. On April 24, 1990, the vehicle in which Washington was riding was stopped on Interstate 95 by a member of the Volusia County Sheriff's Department's Selective Enforcement Team ("SET"). As a result of that stop and ensuing events, Washington sued Volusia County and its Sheriff, Robert Vogel. At trial, Washington sought to prove that she was stopped solely based on her race, pursuant to a race-based drug courier profile. She maintained that the asserted reason for the stop—speeding—was pretextual. Washington attempted to show that Sheriff Vogel and Volusia County had a custom or policy of targeting African–American motorists on Interstate 95, and of stopping those motorists on pretext for the purpose of seizing U.S. currency. Washington claimed damages pursuant to 42 U.S.C. § 1983 on the basis that the Defendants' alleged conduct violated her Fourth Amendment and Equal Protection rights.

Through the testimony of Dr. William Pammer, Washington sought to introduce statistical proof that a significant disparity existed between the percentage of African–American motorists who routinely traveled on Interstate 95 in Volusia County, and the percentage of African–American motorists who were stopped by SET during the time period relevant to this case.[1] The proffered statistical evidence was not relevant to the issue of whether Washington, in particular, was stopped on the basis of her race. *See Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 952 (11th Cir.1991). ("To say that very few blacks have been selected by Honda does not say a great deal about Honda's practices unless we know how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants"), *cert. denied,* 502 U.S. 1058, 112 S.Ct. 935, 117 L.Ed.2d 106 (1992). However, Washington asserted that Dr.

---

1. The proffered statistical evidence concerned only African–American motorists. Hence, it had no relevance to Hispanic Co–Plaintiff Jorge Nater's claims. The Plaintiffs did not offer any statistical evidence relating to Hispanic motorists.

Pammer's testimony was relevant to the issue of whether the Defendants had a custom and policy of targeting African–American motorists for pretextual stops on I–95. Defendants countered that the evidence was irrelevant unless the expert also considered data pertaining to the percentage of African–American motorists who commit traffic violations.

### *Analysis*

Dr. Pammer's opinion was primarily based upon three factors. First, Dr. Pammer relied on an analysis of the stops, searches and seizures which were captured on videotape and maintained by the Sheriff's Department. However, with a few exceptions, those videotapes showed only the events which took place after alleged traffic violations had already been committed. The tapes, therefore, have no relevance to the issue of whether the stops were pretextual. Moreover, it is undisputed that the stops preserved on videotape represent only 10% of the total stops made by the SET during the period in question. There was no evidence upon which Dr. Pammer could conclude that the taped stops were representative of the other 90%.

The videotapes were admitted into evidence at trial. In fact, Washington presented portions of the videotapes for the purpose of showing that the Defendants had a custom or policy of conducting pretextual stops of African–American motorists. The parties stipulated to the percentage of African–American motorists depicted in the tapes. No expert testimony was needed to expound further on that issue. Hence, Dr. Pammer's expert testimony would not have assisted the trier of fact in understanding the evidence or in determining a fact in issue.

Second, Dr. Pammer's opinion was based on a traffic study which compared the rates of traffic violations between African–American and white motorists on the New Jersey Turnpike. Dr. Pammer did not independently verify the New Jersey study and he was unable to justify application of the study to comparative rates of traffic violations between black and white motorists on that portion of I–95 in Volusia County relevant to this case. Dr. Pammer recognized that one could not generalize the rates of traffic violations in Florida based on a study done in New Jersey. Deposition of Dr. Pammer (Dkt. 199) at 58. Moreover, Dr. Pammer reviewed and analyzed only portions of the New Jersey study. Prior to trial, Washington's counsel disclosed only selected portions of the survey to defense counsel instead of presenting the entire survey for their review. This prejudiced defense counsel's ability to properly prepare for trial on this issue.

Finally, Dr. Pammer was prepared to testify about a study done by Diane Bordner, who was hired by Washington's counsel to determine the percentage of black motorists traveling on I–95 in Volusia County in March 1994 between the hours of 11:00 a.m. and 6:00 p.m. The Bordner study is flawed for several reasons.[2] Dr. Pammer's statistics indicate that greater than 60 percent of stops were made outside the 11:00 a.m.–6:00 p.m. time frame. Accordingly, a study focusing on that daytime time frame had little, if any, relevance. Moreover, the study was conducted three years after the stop involving Washington. The study was performed during early March. That is the time "Bike Week" is held in Daytona Beach. A survey to ascertain the percentages of black and white motorists traveling I–95 in Volusia County during "Bike Week" is as meaningful as one undertaken during "Black College Reunion Weekend." Reliable conclusions about the representative percentages of African–Americans and whites traveling that stretch of highway during other times of the year simply cannot be drawn from surveys taken during those unrepresentative time frames. Indeed, Dr. Pammer himself recognized that the fact that the survey was conducted in early March "could affect some variations in race." Deposition of Dr. Pammer (Dkt. 199) at 96. Dr. Pammer also acknowledged that "it would be almost impossible to sit out on a highway at night and try to make judgments as to who's a black driver and who's a black passenger." Deposition of Dr. Pammer (Dkt. 199) at 110. Fur-

---

**2.** The flaws in the Bordner study were recognized by Dr. Pammer who did not intend to give the study any statistical significance (Dkt. 199) at 110.

ther, the fact that Bordner was hired by Washington's counsel further taints the validity of her findings. As pointed out by the Ninth Circuit in *Daubert* after remand from the U.S. Supreme Court, "in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995).

The majority of cases applying Rule 702 since *Daubert* discuss scientific evidence in the context of causation in products liability cases. *See Bradley v. Brown*, 42 F.3d 434 (7th Cir.1994); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir.1994); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994). As a result of their different context, those cases are not particularly helpful in resolving the evidentiary issue presented in this case. Here, Washington attempts to use statistical evidence to prove Defendants had a custom or policy of permitting race-based pretextual stops. While it is true that statistical evidence can be an appropriate method for demonstrating discrimination and pretext, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–805, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973), statistics as well as scientific evidence must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795.

Applying the *Daubert* analysis to the instant case, this Court first considered whether the expert's testimony was supported by "good grounds," and then whether the expert's testimony would have assisted the trier of fact in understanding the evidence or in determining a fact in issue. *See, O'Conner,* 13 F.3d at 1106. Since Dr. Pammer's proposed testimony met neither requirement, the Court excluded it.

### Conclusion

Based on the foregoing, it is

ORDERED that Defendants' Motion in Limine to Exclude Plaintiffs' Statistical Evidence (Dkt. 164) is GRANTED.

DONE AND ORDERED.